MURRAY, and wife, Respondents, v. HOLIDAY RAMBLER, INC., Appellant: KOA TRAILER SALES, INC., Defendant.

*No. 75-565. Submitted on briefs February 8, 1978.— Decided May 2, 1978.*
(Also reported in 265 N. W. 2d 513.)

For the appellant the cause was submitted on the briefs of *Frank E. Betz, John A. Kaiser* and *Betz, LeBarron & Poquette* of Eau Claire, and *Ronald J. Carey* of Menomonie.

For the respondent the cause was submitted on the brief of *Phillip M. Steans* and *Solberg & Steans* of Menomonie.

For the defendant the cause was submitted on the brief of *Robert F. Muza, Paul Van Berkel* and *Muza & Muza* of Menomonie.

CONNOR T. HANSEN, J. On January 23, 1974, the plaintiffs purchased a 22-foot 1973 Avenger motorhome for a total sales price, including sales tax, license fees and trade-in allowance on another motorhome owned by the plaintiffs, of $11,007.15.

Before taking delivery of the motorhome on January 30, 1974, Mr. Murray signed a "PRE-DELIVERY IN-SPECTION & ACCEPTANCE DECLARATION," acknowledging that he had inspected or had been given a

demonstration of various components of the motorhome, and that these items had performed or had been explained to his satisfaction. Mr. Murray testified that he had gone through the items on this check list and had accepted the motorhome. He further testified that he had read "some" of the document and received a copy of it. The "PRE-DELIVERY INSPECTION & ACCEPTANCE DECLARATION" contained the warranty which is the basis for this litigation.

The plaintiffs had problems with the motorhome from the day they took possession. It was returned repeatedly to KOA Trailer Sales, Inc. (hereinafter KOA) as an authorized dealer for the manufacturer, Holiday Rambler, Inc., (hereinafter Holiday Rambler), and various repairs and adjustments were performed at the expense of Holiday Rambler. Mr. Murray estimated that by July, 1974, the motorhome had been returned to KOA nine or ten times.

In July, 1974, the plaintiffs traveled to Colorado in the motorhome. On the trip they experienced difficulty with the operation of it in a number of respects. We describe the various problems with the vehicle in greater detail in discussing the issue of whether the limited warranty had failed its essential purpose.

On returning to Wisconsin in mid-July, the Murrays took the motorhome to KOA, and were assured that it would be repaired, either by KOA or by Holiday Rambler, apparently without expense to the Murrays. There was testimony that the Murrays agreed to this.

Arrangements were then made to have the vehicle taken to the Holiday Rambler factory in Wakarusa, Indiana, for any necessary adjustments. Holiday Rambler informed the Murrays, however, that they would be required to pick up the vehicle at the Indiana factory themselves.

Mr. Murray decided not to have the repairs made. Instead, he picked up the motorhome at KOA, drove it home and hired a lawyer. By letter dated August 15, 1974, the Murrays informed KOA that they were revoking acceptance of the motorhome and that they demanded payment of $11,900. In September, 1974, KOA apparently offered to reimburse the Murrays for the expense of traveling to the Holiday Rambler factory, but the Murrays rejected this offer, and this action was commenced.

The after-verdict motions of defendant, KOA, to change the jury's answers to certain questions and for judgment notwithstanding the verdict were denied, and judgment was entered in accordance with the verdict.[1]

Holiday Rambler has appealed, and the plaintiffs have filed a notice of review with regard to the trial court's exclusion of evidence of plaintiffs' litigation expenses. KOA has been admitted as a party pursuant to sec. 817.12(6), Stats.

The issues presented are as follows:

1. Does Holiday Rambler's limited warranty, together with its disclaimer of all other warranties, preclude revocation of acceptance of the motorhome?

2. Were the plaintiffs entitled to revoke acceptance of the motorhome?

3. Were the plaintiffs entitled to recover damages for loss of use of the motorhome?

4. Did the trial court err in excluding evidence of plaintiffs' litigation expenses?

5. Did the trial court err in instructing the jury with regard to prejudgment interest?

---

[1] The judgment in the amount of $14,923.03 includes $11,007.15 for the purchase price of the vehicle, $110 for inspection fees, $51.72 as reimbursement for repairs, $800 for interest and transportation costs, $2,500 for loss of use of the motorhome, and $455.78 in costs.

### LIMITED WARRANTY AND WARRANTY DISCLAIMER.

Holiday Rambler and KOA contend on this appeal that the limited express warranty given by Holiday Rambler prevents the plaintiffs from revoking acceptance of the motorhome.

Under the Uniform Commercial Code, (hereinafter UCC) a seller of goods may limit his contractual liability in two ways. He may disclaim or limit his warranties, pursuant to sec. 402.316, Stats., or he may limit the buyer's remedies for a breach of warranty, pursuant to sec. 402.719. These methods are closely related, and in many cases their effect may be substantially identical. *K-Lines, Inc. v. Roberts Motor Co.*, 273 Ore. 242, 541 Pac.2d 1378 (1975); White and Summers, Handbook of the Law Under the Uniform Commercial Code (hornbook series, 1972) (hereinafter White and Summers), sec. 12–8, p. 375. Conceptually, however, they are distinct. A disclaimer of warranties limits the seller's liability by reducing the number of circumstances in which the seller will be in breach of the contract; it precludes the existence of a cause of action. A limitation of remedies, on the other hand, restricts the remedies available to the buyer once a breach is established. White and Summers, *supra*, sec. 12–11, pp. 383, 384.

In the present case we believe the "PRE-DELIVERY INSPECTION & ACCEPTANCE DECLARATION" is an attempt to both disclaim warranties and limit the remedies available to the buyer upon breach.

Sec. 402.316, Stats.[2] permits a seller to limit or exclude both implied and express warranties. *See, Recreatives,*

---

[2] Sec. 402.316, Stats., provides:

*"402.316 Exclusion or modification or warranties. (1)* Words or conduct relevant to the creation of an express warranty and

*Inc. v. Myers,* 67 Wis.2d 255, 264, 265, 226 N.W.2d 474 (1975). Language limiting implied warranties must be conspicuous and otherwise consistent with the provisions of sec. 402.316 and must not be unconscionable in light of the circumstances at the time the contract was made. Sec. 402.302.

The document signed by Mr. Murray purported to exclude all warranties, express or implied, and stated in part, above his signature:

*"WARNING: THE PURCHASER IS EXPECTED TO READ THIS DOCUMENT BEFORE IT IS SIGNED.*

words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to s. 402.202 on parol or extrinsic evidence, negation or limitation is inoperative to the extent that such construction is unreasonable.

*"(2)* Subject to sub. (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'

*"(3)* Notwithstanding sub. (2):

"(a) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

"(b) When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

"(c) An implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

*"(4)* Remedies for breach of warranty can be limited in accordance with ss. 402.718 and 402.719 on liquidation or limitation of damages and on contractual modification of remedy."

". . . THE PURCHASER SHOULD NOT SIGN THIS STATEMENT UNTIL ALL OF THE ITEMS INDICATED ABOVE HAVE EITHER BEEN PERFORMED OR EXPLAINED TO HIS SATISFACTION. . . ."

"The undersigned parties attest to the fact that the above representations are, to the best of their knowledge, true and that the purchaser has received a copy of this Pre-Delivery Inspection and Acceptance Declaration and read thoroughly the MANUFACTURER'S UNDERTAKING AVENGER CORPORATION on the reverse side."

The reverse side of this document stated:

"MANUFACTURER'S UNDERTAKING—
AVENGER CORPORATION[3]

"THERE ARE NO WARRANTIES EXPRESSED OR IMPLIED AND PARTICULARLY THERE ARE NO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE MADE BY AVENGER CORPORATION FOR ITS PRODUCTS.

"AVENGER CORPORATION, as the manufacturer, in lieu thereof *undertakes and agrees that the product identified on the Pre-Delivery and Acceptance Declaration (reverse side) was free of defects in material and workmanship at the time of its delivery to the dealer and the initial user and owner;* and

"If the attached Pre-Delivery and Acceptance Declaration is properly filled out and returned to Avenger Corporation at Nappanee, Indiana, within five days of delivery of this trailer to the original user; and

"If such Avenger product or its component parts (other than tires*) shall fail within one year from the date of delivery to the original user because the product or component part was defective when installed; and

"If the owner-user will return the trailer to a service facility authorized by Avenger Corporation within fifty-two (52) weeks after initial delivery, *Avenger Corporation will in the method it determines to be necessary replace, or repair, at its sole option any such defective product or component at its own cost and expense.*

---

[3] The Avenger Corporation, now dissolved, was a wholly-owned subsidiary of Holiday Rambler.

"THERE ARE NO *OTHER* WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AND NO *OTHER* OBLIGATIONS, EITHER EXPRESS OR IMPLIED, INCLUDING SPECIFICALLY ANY OBLIGATION FOR INCIDENTAL EXPENSES OF ANY NATURE UNDERTAKEN BY AVENGER CORPORATION AS THE MANUFACTURER. (Emphasis added.)

"* Tires are warranted separately by their respective manufacturer through their dealer. See separate warranty which accompanies the trailer."

The language used in the document constitutes a warranty ". . . that the product . . . was free of defects in material and workmanship at the time of its delivery . . ."[4] Because this express warranty conflicts with the preceding disclaimer of all warranties, the language of express warranty must control. White and Summers, *supra,* at sec. 12–3, p. 352.

Official Comment 1 to sec. 2–316, UCC (sec. 402.316, Stats., *supra*) states that that section:

". . . is designed principally to deal with those frequent clauses in sales contracts which seek to exclude 'all warranties, express or implied.' It seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty. . . ."

The undertaking in the instant case therefore constitutes a warranty that the motorhome was free of defects at the time of delivery, subject to whatever limita-

---

[4] The fact that this warranty is denominated an "undertaking" is not significant. Formal words such as "warrant" or "guarantee" need not be used to create an express warranty. Sec. 402.313 (2), Stats. Further, an "undertaking" is defined in part as "3. A promise or pledge; a guarantee; . . ." Webster's New International Dictionary (2d ed.).

tion is effected by the limitation of remedies language contained therein.[5]

The damages which would otherwise be available upon a breach of contract may be altered or limited by the parties pursuant to sec. 402.719, Stats.[6] This section gives the parties substantial latitude to fashion their own remedies for breach of the contract. However, the UCC disfavors limitations on remedies and provides for their deletion where they would effectively deprive a party of reasonable protection against breach. *Chemetron Corporation v. McLouth Steel Corporation* (D.C. Ill. 1974), 381 Fed. Supp. 245, 250, *affirmed* 522 Fed.2d 469 (7th Cir. 1975).

The drafters of the UCC recognized that:

". . . it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the

---

[5] Holiday Rambler and KOA apparently acknowledge this point. Despite the drafter's efforts to avoid the word "warranty," both Holiday Rambler and KOA refer, in their briefs, to the "undertaking" as a "warranty."

[6] Sec. 402.719, Stats., provides:

"*402.719 Contractual modification or limitation of remedy. (1)* Subject to subs. (2) and (3) and to s. 402.718 on liquidation and limitation of damages:

"(a) The agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

"(b) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

"*(2)* Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code.

"*(3)* Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract . . ."

Official Comment 1, sec. 2–719, UCC; *accord: Conte v. Dwan Lincoln-Mercury, Inc.*, 172 Conn. 112, 374 Atl.2d 144 (1976) ; *Wilson Trading Corporation v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 244 N.E.2d 685 (1968).

Accordingly, any clause purporting to limit remedies in an unconscionable manner will be deleted, making the ordinary UCC remedies available as though the stricken clause had never existed. Official Comment 1, sec. 2–719, UCC.

In addition, sec. 402.719 (2), Stats., provides :

*"(2)* Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code."

This provision dictates that:

". . . [W]here an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article [Chapter 402, Stats.]." Official Comment 1, sec. 2–719, UCC.

The warranty in the present case, like most motor vehicle warranties, limited the buyer's remedies to repair or replacement of defective parts.

Specifically, the "undertaking" provides :

". . . Avenger Corporation will in the method it determines to be necessary replace or repair, at its sole option any such defective product or component at its own cost and expense.

"THERE ARE NO OTHER WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AND NO OTHER OBLIGATIONS, EITHER EXPRESS OR LIMITED, INCLUDING SPECIFICALLY ANY OBLIGATION FOR

INCIDENTAL EXPENSES OF ANY NATURE UNDERTAKEN BY AVENGER CORPORATON AS THE MANUFACTURER."

Such a limitation is not, on its face, unconscionable. *Cox Motor Car Company v. Castle* (Ky. App. 1966), 402 S.W. 2d 429; *Potomac Electric Pow. Co. v. Westinghouse Elec. Corp.* (D.C. 1974), 385 Fed. Supp. 572. Sec. 402.719(2), Stats., specifically recognizes the possibility of such a limitation.

However, where the limited remedy fails of its essential purpose, the limitation will be disregarded and ordinary UCC remedies will be available. Sec. 402.719(2), Stats. The purpose of an exclusive remedy of repair or replacement, from the buyer's standpoint, is to give him goods which conform to the contract—in this case, a motorhome substantially free of defects—within a reasonable time[7] after a defect is discovered. *Conte v. Dwan Lincoln-Mercury, supra; Beal v. General Motors Corp.* (D.C. Del. 1973), 354 Fed. Supp. 423; *Moore v. Howard Pontiac-American, Inc.*, (Tenn. App. 1972), 492 S.W.2d 227.

". . . [E]very buyer has the right to assume his new car, with the exception of minor adjustments, will be 'mechanically new and factory furnished, operate perfectly, and be free of substantial defects' . . .

"After the purchase of an automobile, the same should be put in good running condition; that is the seller does not have an unlimited time for the performance of the obligation to replace and repair parts. The buyer of an automobile is not bound to permit the seller to tinker with the article indefinitely in the hope that it may ultimately be made to comply with the warranty. 46 Am. Jur. Sales §732; 77 C.J.S. Sales §340. At some point in time, if major problems continue to plague the automobile, it must

---

[7] What is a "reasonable time" for taking any action under the Uniform Commercial Code depends on the nature, purpose and circumstances of such action. Sec. 401.204(2), Stats.

become obvious to all people that a particular vehicle simply cannot be repaired or parts replaced so that the same is made free of defect. . . ." *Orange Motors of Coral Gables v. Dade Co. Dairies,* 258 So.2d 319, 320, 321 (Fla. App. 1972), *quoting Zabriskie Chevrolet, Inc. v. Smith,* 99 N.J. Super. 441, 240 Atl.2d 195 (1968). *Accord, General Motors Corporation v. Earnest,* 279 Ala. 299, 184 So. 2d 811, 814 (1966).

[7]

Although individual nonconformities may not be substantial in and of themselves, the obligation to repair or replace parts may fail of its essential purpose where the cumulative effect of all the nonconformities substantially impairs the value of the goods to the buyer. *Zoss v. Royal Chevrolet, Inc.,* 11 U.C.C. Rep. 527, 532 (Ind. Super. 1972).

Where the seller is given reasonable opportunity to correct the defect or defects, and the vehicle nevertheless fails to operate as should a new vehicle free of defects, the limited remedy fails of its essential purpose. *See, Soo Line Railroad Co. v. Fruehauf Corp.* (8th Cir. 1977), 547 Fed.2d 1365; *Ehlers v. Chrysler Motor Corporation* (S.D. 1975), 226 N.W.2d 157; *Kohlenberger, Inc. v. Tyson's Foods, Inc.,* 256 Ark. 584, 510 S.W.2d 555 (1974) ; *Beal v. General Motors Corp., supra; Ford Motor Company v. Gunn,* 123 Ga. App. 550, 181 S.E.2d 694 (1971). The buyer may then invoke any of the remedies available under the UCC, including the right to revoke acceptance of the goods, under sec. 2–608 of the UCC (sec. 402.608, Stats.). *Moore v. Howard Pontiac-American, Inc., supra; Jacobs v. Metro Chrysler-Plymouth, Inc.,* 125 Ga. App. 462, 188 S.E.2d 250 (1972).

In the present case the jury determined that the plaintiffs had cause to revoke the acceptance of the motorhome. The verdict of a jury will not be disturbed by

this court if, viewing the evidence in the light most favorable to the verdict, any credible evidence fairly admits of an inference supporting the verdict. *Nolden v. Mutual Benefit Life Ins. Co.,* 80 Wis.2d 353, 359, 259 N.W.2d 75 (1977). Here there was ample credible evidence to support the jury's implicit finding that the defendants had failed to provide the plaintiffs with a motorhome substantially free of material defects within a reasonable time.

The testimony favorable to the verdict showed the following: Mr. Murray experienced problems with the lights and battery of the vehicle on the day he took possession and, although repairs were attempted, the lights continued to dim, the electrical system went dead on several occasions, and the generator did not charge the battery properly. The wiring of an outdoor light short-circuited where it passed through a sharp-edged metal wall. There were problems with the clock. There was an exposed, allegedly non-energized, 120-volt wire coming from the main electrical panel. Plaintiffs' expert witness testified that the wiring in the 12-volt electrical system was of an insufficient gauge for the type of fuses used by the manufacturer, that this wiring was not in conformity with the applicable electrical code, and that there was a danger of overheating in the electrical system.

The original gas tank and an auxiliary gas tank, installed by KOA at the Murrays' request prior to delivery, were both apparently improperly vented. As a result, it was extremely difficult to fill the tanks; gasoline would spew out of the tanks when the caps were removed; and gasoline fumes came up into the passenger compartment. Mr. Murray testified that on one occasion, service station attendants were able to put only twenty cents' worth of gasoline into both tanks. Apparently as a result of problems with the carburetor, the vehicle would

stall. Dirt and soldering flux were found in the fuel filter, which was replaced, as was the fuel pump.

There were problems with the air suspension system. There was testimony that this resulted in uneven distribution of weight on the tandem set of wheels in the rear of the vehicle, putting insufficient weight on the front wheels and causing steering problems. Repairs were made to the suspension system, but the steering problems persisted. Mr. Murray complained that the front brakes were not operating properly, and despite adjustments, had difficulty with the front wheels.

KOA apparently remedied various problems with the furnace and refrigerator, with an oil filter, and with a rattling engine cowling. KOA corrected the LP fuel tank gauge, which, as installed at the factory, indicated "full" when the tank was empty, and vice versa; KOA also supplied a missing handle for the tank and drained water which was inside the tank when it left the factory.

Unusual pressure caused a water line to come uncoupled. Mr. Murray advised KOA about this problem but repaired it himself.

There was also testimony regarding problems with folding seats, the furnace fan, the exhaust fan above the stove, a splash board which came unfastened, and the oven door, which fell off. Although there was conflicting testimony as to whether these parts were defective, the testimony of the Murrays with regard to these problems was not inherently incredible.

It is the position of the defendants that KOA successfully repaired every defect complained of by the Murrays, and that the Murrays were satisfied with the repair service. The evidence on this point was conflicting, and the jury could reasonably have believed Mr. Murray's testimony that he had never told KOA he was satisfied with the vehicle and that, on the contrary, he had repeatedly

sought to return the troublesome Avenger and to recover his purchase price and the motorhome he had traded in.

Although the Murrays agreed that KOA had never refused to attempt a requested repair, this testimony does not affect their right to revoke acceptance. The limited remedy of repair or replacement of defective parts fails of its essential purpose whenever, despite reasonable opportunity for repair, the goods are not restored to a non-defective condition within a reasonable time, whether or not the failure to do so is willful. *Soo Line Railroad Co. v. Fruehauf Corp., supra,* at 1371, *fn. 7; Beal v. General Motors Corp., supra,* at 427.

In July, 1974, the Murrays traveled to Colorado in the motorhome. They experienced continued problems filling the gasoline tanks. At one point they were forced to leave the vehicle to avoid gasoline fumes which filled the interior. Gasoline spewed from the tanks when the tank caps were removed, and they were asked to leave one service station after the attendant was thus doused with gasoline.

Mr. Murray testified that the vehicle stalled while ascending one mountain and that the rear brakes malfunctioned while descending another.

On the return trip, the electrical system malfunctioned while the Murrays were inside a South Dakota restaurant. Lights came on; smoke filled the vehicle, and wiring was burned. Defendants' expert agreed that this fire may have been caused by a short circuit where a wire passed through the sharp-edged metal wall of the vehicle.

After this incident, the electrical system did not charge properly, and the plaintiffs were unable to use the air-conditioner. The plaintiffs opened the windows, and several screens blew out. The electrical system went out completely in Ellsworth, Wisconsin, and the plaintiffs

traveled the rest of the way to their home near Menomonie, Wisconsin, by automobile.

This evidence amply supports the conclusion that, despite reasonable opportunity for repair, the defendants had failed to provide the Murrays with goods conforming to the contract—that is, with a safe and substantially non-defective motorhome—within a reasonable time after purchase. The limited remedy therefore failed of its essential purpose, and the remedy of revocation became available. Also, under the warranty, Holiday Rambler was to bear the expense of repairs or replacements. Nevertheless, they initially insisted the Murrays travel to Indiana, at their own expense, to pick up the motorhome after it had been repaired.

KOA argues that the trial court erred in failing to submit to the jury a requested special verdict question asking whether the plaintiffs were obliged to permit the defendants to correct any nonconformities. KOA argues that by refusing to submit this question, the trial court removed from the jury the necessary question whether the limited remedy had failed of its essential purpose. This argument is not persuasive.

The form of the special verdict is within the sound discretion of the trial court and will not be interfered with if the material issues of fact are encompassed within the questions asked and appropriate instructions are given. *Naden v. Johnson,* 61 Wis.2d 375, 382, 212 N.W.2d 585 (1973). In the instant case, the special verdict questions submitted to the jury implicitly encompassed the question whether the limited remedy had failed of its essential purpose, and no objections are raised with regard to the trial court's jury instructions on the plaintiffs' right to revoke acceptance.

The jury was asked:

"... Were there any nonconformities in the motor-home as delivered to the plaintiffs *that the plaintiffs reasonably assumed would be cured and were not reasonably cured?*" (Emphasis added.)

The jury answered "yes," indicating that repairs were not made as required by the limited warranty. In response to other questions, the jury found that the non-conformities substantially impaired the value of the motorhome; that the plaintiffs had cause to revoke acceptance; that the vehicle was negligently manufactured by Holiday Rambler and negligently modified or repaired by KOA, and that the negligence of both defendants substantially impaired the value of the motorhome. By these findings the jury determined that the limited remedy of repair or replacement had failed.

In *Riley v. Ford Motor Company* (5th Cir. 1971), 442 Fed.2d 670, the jury had not been specifically instructed to determine whether an auto manufacturer's obligation to replace or repair defective parts had failed of its essential purpose. However, *Riley, supra,* at 673, held that a finding that the remedy had failed was implicit in the jury's verdict, where the jury had been instructed to determine:

"... whether 'the defendant, Ford Motor Company, has breached its warranty and [whether] they were given a reasonable opportunity to repair it and they didn't [.]' "

and where the amount of the verdict showed that the jury had not given effect to the limited remedy.

Following the same rationale, we conclude that the jury in the instant case found that the limited remedy had failed. There was abundant credible evidence to support this finding. The plaintiffs were therefore entitled to avail themselves of the remedies available under the UCC, including the right to revoke acceptance pursuant to sec. 402.608, Stats.

## REVOCATION OF ACCEPTANCE.

Pursuant to sec. 402.608, Stats.,[8] acceptance may be revoked where nonconformities *substantially impair the value* of the goods to the buyer and where acceptance is revoked *within a reasonable time* and *before any substantial change* in the condition of the goods.

The jury found that the various nonconformities substantially impaired the value of the motorhome to the plaintiffs, and the defendants do not challenge this finding directly. KOA does so indirectly, however, when it states that the defects could have been repaired for approximately $200 and that this figure was minor in relation to the purchase price.

However, the $200 figure, offered by the defendants' witnesses, did not reflect approximately $150 expended in previous efforts at repair by KOA and approximately $50 expended by the plaintiffs for various repairs. Nor did it include any incidental or consequential damages incurred by the plaintiffs. Moreover, this estimate included only the cost of replacing damaged wiring and

[8] Sec. 402.608, Stats., provides:

". . . *Revocation of acceptance in whole or in part.* *(1)* The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it;

"(a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

"(b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

"*(2)* Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

"*(3)* A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."

adjusting the seats in the vehicle; it did not include any allowance for correction of the reported problems with the gas tanks, suspension system, brakes or various minor items. On this record, and considering the nature of the reported problems with gasoline fumes, electrical short circuits and brake malfunctions, the jury could reasonably have concluded that the nonconformities substantially impaired the value of the vehicle to the plaintiffs.

KOA next contends that the plaintiffs did not revoke acceptance within a reasonable time or before a substantial change in the condition of the motorhome. These are questions of fact for the jury. By the time of trial, the plaintiffs had driven the motorhome approximately 3,650 miles, including approximately 2,200 miles on the Colorado trip. However, Mr. Murray testified that he had repeatedly asked KOA to accept return of the motorhome and to give him back his purchase price. These requests were refused. In view of Mr. Murray's testimony that he had no use of the motorhome from the time he took possession on January 30, 1974, until the time he first sought to revoke acceptance on March 10, 1974, the jury could reasonably have found that there had been no substantial change in the condition of the motorhome.

Moreover, the formal revocation of August 15, 1974, followed months of nearly continuous efforts at repair. It is the policy of the Uniform Commercial Code to encourage parties to minimize losses resulting from defective performance by working out their differences. White and Summers, *supra*, at sec. 8–2, p. 252, *fn.* 15. The defendants had a right, under the limited warranty, to attempt to cure the nonconformities within a reasonable time, and the plaintiffs justifiably awaited the results of these efforts. The UCC recognizes that, because revocation of acceptance:

". . . will be generally resorted to only after attempts at adjustment have failed, the reasonable time period

should extend in most cases beyond the time in which notification of breach must be given, beyond the time for discovery of non-conformity after acceptance and beyond the time for rejection after tender. . . ." Official Comment 4, sec. 2–608, UCC.

In *Conte v. Dwan Lincoln-Mercury, Inc., supra,* the buyer of a defective automobile had revoked acceptance some fourteen months after purchase. The Supreme Court of Connecticut held that this revocation was not untimely as a matter of law, and said:

". . . Although the plaintiff did not revoke his acceptance until fourteen months after the sale, it is significant that he was in almost constant touch with the dealer concerning the condition of the vehicle, relying on the dealer's continued assurances that the automobile would be repaired satisfactorily. When it became apparent to the buyer that repeated attempts at adjustment had failed, he unequivocally notified Dwan that he was revoking his acceptance. Under the circumstances of this case, involving an almost continuous series of negotiations and repairs, the delay in the notice did not prejudice the dealer and the delay was not unreasonable . . . Continued use of the automobile was inevitable while there was an attempt to cure the defects as they became apparent and such use did not defeat the revocation in this case. The jury could have reasonably concluded that the revocation was timely and justifiable. The plaintiff was, therefore, entitled to recover the amount of the purchase price which he had already paid . . ." *Conte v. Dwan Lincoln-Mercury, supra,* at 149; *see also: Tiger Motor Co. v. McMurty,* 224 So.2d 638, 284 Ala. 283 (1969) (upholding revocation of acceptance after 11 months and 20,000 miles) ; and *Zoss v. Royal Chevrolet, Inc. supra* (allowing revocation of acceptance after three months and 4,-200 miles).

For the same reasons, the jury in the instant case could reasonably have determined that the plaintiffs were entitled to revoke acceptance of the motorhome.

## DAMAGES FOR LOSS OF USE.

The jury awarded the plaintiffs $2,500 for loss of use of the motorhome from the date of revocation of acceptance, August 15, 1974, to the date of the verdict. KOA argues that the plaintiffs were precluded by the terms of the limited warranty from recovering any incidental or consequential damages, including any damages for loss of use of the vehicle.

Where the exclusive limited remedy of the contract fails of its essential purpose, however, the buyer is entitled to invoke any of the remedies available under the UCC. Sec. 402.719 (2), Stats. This includes the right to recover consequential damages under sec. 402.715.[9]

Consequential damages include any loss caused by general or particular needs of the buyer of which the seller had reason to know at the time of contracting and which could not reasonably be prevented by cover or otherwise. Sec. 402.715 (1), Stats. Consequential damages have specifically been held to include damages for loss of use of an inoperable motor vehicle. *Bob Anderson Pontiac, Inc. v. Davidson* (Ind. App. 1973), 293 N.E.2d 232; *Williams v.*

---

[9] Sec. 402.715, Stats., provides:

". . . *Buyer's incidental and consequential damages.* (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"*(2)* Consequential damages resulting from the seller's breach include:

"(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

"(b) Injury to person or property proximately resulting from any breach of warranty."

*College Dodge, Inc.*, 11 UCC Rep. 958 (Mich. Dist. Ct. 1972).

A buyer has a general duty to mitigate his damages and may not recover damages which he could reasonably have prevented. Sec. 402.715(2)(a), Stats., White and Summers, *supra*, at sec. 10-4, p. 323. For this reason, loss-of-use damages may not be recovered for an indefinite period. However, such damages are properly available for periods during which a buyer, relying in good faith on the seller's assurances that defects will be cured, is unable to use the vehicle which he has purchased. *See, Jerry Alderman Ford Sales, Inc. v. Bailey* (Ind. App. 1972), 291 N.E.2d 92, 105.

The defendant, KOA, relies upon *Russo v. Hilltop Lincoln-Mercury, Inc.* (Mo. App. 1972), 479 S.W.2d 211. There, defective wiring had caused an automobile to be totally burned. The Missouri Court of Appeals held that, because the car could not be repaired, the limited warranty remedy of repair or replacement of defective parts was inapplicable. Accordingly, the buyer was allowed to recover, not merely the replacement cost of the defective wiring, but rather the full value of the car.

Implicit in this holding was a determination that the limited warranty remedy had failed of its essential purpose. Nevertheless, when the Missouri court turned to the buyer's claim for damages for the rental cost of a replacement car, the court held that such damages were excluded by the terms of the warranty and that this exclusion had not failed of its essential purpose.

This result is inconsistent with the many decisions which have held that consequential damages may be recovered where a limited contractual remedy excluding such damages has failed. *Ehlers v. Chrysler Motor Corporation, supra; Beal v. General Motors Corp., supra; Koehring Company v. A.P.I., Incorporated* (D.C. Mich. 1974), 369 Fed. Supp. 882; *Reynolds v. Preferred Mutual*

*Insurance Co.* (Mass. App. Div. 1972), 11 UCC Rep. 701; *Adams v. J. I. Case Company,* 125 Ill. App.2d 388, 261 N.E.2d 1 (1970).

Moreover, the result of the *Russo Case, supra,* which permitted the buyer to recover some UCC damages but not others, is inconsistent with the apparent intention of the drafters. Sec. 402.719 (2), Stats., provides that once a limited remedy fails of its essential purpose "remedy may be had as provided in this code." In such a case the exclusive contractual remedy ". . . must give way to the general remedy provision of this Article [chapter 402, Stats.]." Official Comment 1, sec. 2–719 UCC.

Thus, although an express warranty excludes consequential damages, when the exclusive contractual remedy fails, the buyer may recover consequential damages under sec. 402.715, Stats., as though the limitation had never existed. White and Summers, *supra,* at sec. 12–10, p. 382. The instant plaintiffs were therefore entitled to recover any consequential damages which they could prove, including reasonable damages incurred as a result of loss of use of the motorhome.

However, we are of the opinion that the plaintiffs have not sustained their burden of proof with regard to loss of use damages in the amount of $2,500. Consequential damages need not be shown with mathematical precision. Official Comment 4, sec. 2–715, UCC. Nevertheless, the burden of proving consequential damages is on the buyer, Official Comment 4, sec. 2–715, UCC; he must prove by credible evidence to a reasonable certainty that such damages were suffered and must prove, at least to a reasonable probability, the amount of these damages. *See: Pleasure Time, Inc. v. Kuss,* 78 Wis.2d 373, 387, 254 N.W. 2d 463 (1977) ; *Naden v. Johnson, supra,* at 387. Damages may not be awarded on speculation or conjecture

alone. *Pleasure Time, Inc. v. Kuss, supra,* at 387, 388; White and Summers, *supra,* at sec. 10–4, pp. 321, 322.

Here, there was evidence with regard to the period of time during which the motorhome was unusable, and with regard to the approximate rental cost of a replacement motorhome, but there was no evidence of the extent to which the motorhome would have been used by the plaintiffs if it had not been defective.

Mr. Murray testified that he was unable to use the motorhome from January 30, 1974, to March 10, 1974, and the motorhome apparently remained unusable for much of the period from March 10th to July, 1974. Although the plaintiffs made a fishing trip in the motorhome in May without much trouble, they were forced to shorten the Colorado trip by one week as a result of the problems with the vehicle, and the vehicle was not used for any additional trips prior to the trial. It had been driven only once or twice, over a four-mile route between the plaintiffs' former residence and a new residence, and Mr. Murray had lived in it for approximately one week while they were moving.

There was testimony that the rental cost of a comparable vehicle was approximately $155 per week plus eight cents per mile traveled. However, there was no evidence that the Murrays had in fact rented a replacement. Although Mr. Murray testified that the motorhome was purchased ". . . to go on trips, use it for vacations and fishing and whatever you use one for," there was no evidence of the extent to which it would have been used. There was no testimony with regard to any particular trips which the plaintiffs were unable to take. There was no testimony that they were forced to rent alternative transportation. There was no indication of the number of trips they would have taken, the distances they would have traveled, nor the number of days the motorhome would have been used.

Damages for loss of use of a recreational vehicle should be founded upon credible evidence of the use which would have been made of the vehicle if not for the defects, or upon evidence of expenses actually incurred as a result of the vehicle's inoperability. Such losses should not be calculated simply by reference to the number of days the vehicle sits idle, absent evidence that the vehicle would have been in use for the entire period.

The only definite testimony concerning lost use of the motorhome was to the effect that the Colorado trip was cut short by one week. Apart from this testimony, there was no basis from which the jury could determine the amount of any damages suffered by the plaintiffs due to the loss of use of the motorhome. With the exception of damages for this one-week period, the $2,500 damages awarded by the jury were speculative.

Based upon our review of the evidence bearing upon loss of use of the motorhome, we determine that $500 is a reasonable sum to award the plaintiffs for loss of the use of the vehicle. Therefore the plaintiffs are accorded the option of accepting judgment reduced to $500 for loss of use of the motorhome, or of having a new trial confined to the issue of damages for the loss of the use of the motorhome.[10]

### ATTORNEY'S FEES.

The plaintiffs, by notice of review, challenge the exclusion by the trial court of evidence of attorney's fees incurred by the plaintiffs in connection with this action. The plaintiffs argue that these fees are recoverable as

[10] See, Powers v. Allstate Ins. Co., 10 Wis.2d 78, 102 N.W.2d 393 (1960).

incidental or consequential damages under sec. 402.715, Stats.

Generally, except for statutory court costs and fees, a plaintiff may not recover attorney's fees and expenses of litigation in his claim against the defendant unless such liability arises from specific statutory provisions or the contract of the parties. *Cedarburg L. & W. Comm. v. Glens Falls Ins. Co.,* 42 Wis.2d 120, 124, 125, 166 N.W.2d 165 (1969).[11]

No case has come to our attention in which this court has addressed the question whether attorney's fees may be recovered as consequential damages under sec. 402.715, Stats. However, the general principle expressed by this court in the *Cedarburg Case, supra,* is consistent with the rule that, under the UCC, "Attorney's fees, in the absence of statute, are not recoverable as consequential damages. . . ." 2 Anderson, Uniform Commercial Code, sec. 2–715: 28, p. 480.

Thus courts in several jurisdictions have held that attorney's fees may not be recovered as consequential damages under the Uniform Commercial Code in the absence of an express contractual provision to the contrary. *Equitable Lumber Corp. v. IPA Land Development Corp.,* 38 N.Y.2d 516, 344 N.E.2d 391 (1976); *see, Mo-*

---

[11] Attorney's fees and expenses incurred in *third-party* litigation may be recovered where they are the natural and proximate result of the defendant's breach of contract or other wrongful act which has caused the plaintiff to become involved in litigation with third parties. *Cedarburg L. & W. Comm. v. Glens Falls Ins. Co., supra; Widemshek v. Fale,* 17 Wis.2d 337, 117 N.W.2d 275 (1962). However, this rule " '. . . does not deal with the cost of litigation with the defendant himself.' " *Cedarburg L. & W. Comm. v. Glens Falls Ins. Co., supra,* at 125, *quoting* 5 Corbin, *Contracts* (1964), pp. 225, 226, sec. 1037. No third-party litigation expenses are involved here.

*dine Mfg. Co. v. North East Independent School Dist.* (Tex. Civ. App. 1973), 503 S.W.2d 833. Similarly, White and Summers, *supra*, at sec. 10–4, p. 320, *fn.* 57, suggest that, "The recovery of legal fees is probably available in rare circumstances only." (*citing* one pre-UCC decision and one decision involving third-party litigation).

We believe this conclusion is consistent with the purposes of sec. 402.715, Stats. Although the remedy provisions of the UCC are to be liberally construed, sec. 401.106, Stats., it does not appear that litigation expenses are among the incidental and consequential damages recoverable under sec. 402.715. Incidental damages are generally expenses incurred in the handling of nonconforming goods or in the process of effecting cover. *See*, Official Comment 1, sec. 2–715, UCC. Consequential damages arise from the general or particular needs of the buyer which should reasonably have been known to the seller at the time of contracting. *See*, Official Comment 3, sec. 2–715, UCC. Attorney's fees do not appear to be within either of these categories.

In addition, the legislature has expressly provided for the recovery of costs of litigation in statutory amounts, ch. 271, Stats., and we are not inclined to hold that sec. 402.715 was intended as a tacit abrogation of the general statutory rule. There is no evidence that the legislature intended to create a special exception for the limited class of cases which arise under sec. 402.715, nor is there any reason to believe it would do so in an indirect manner. We therefore hold that the plaintiffs' attorneys are not recoverable under sec. 402.715, and that evidence of the plaintiffs' litigation expenses was properly excluded by the trial court.[12]

---

[12] This is not to suggest that expenses of third-party litigation may not, in a proper case, be recovered under sec. 402.715, Stats., in accordance with the principles generally applicable to contract damages. It is unnecessary to consider this question here.

## INTEREST.

In response to a special verdict question, the jury answered that the plaintiffs were entitled to recover $800 for ". . . [i]nterest and transportation cost." With regard to this question, the trial court had instructed the jury to:

". . . insert such sum of money as you feel will fairly and reasonably compensate [the plaintiffs]. I will advise you that the legal rate of interest is seven percent."

The defendants correctly point out that this instruction was erroneous and that the legal rate of interest at the time of this cause of action arose was in fact five percent. Sec. 138.04, Stats. 1973.

The plaintiffs argue that defendants have waived the right to raise this argument because they failed to object to the instruction at trial. Although the defendants failed to object to the instruction before the verdict was returned, it is the rule of this court that where an instruction misstates the law, error can be asserted for the first time after verdict and on motions for a new trial. *Lambert v. State*, 73 Wis.2d 590, 607, 243 N.W.2d 524 (1976). Such motions were made in this case. The merits of the defendants' argument are therefore properly before the court.

The plaintiffs do not deny that the rate of interest stated by the trial court was erroneous. Instead they argue that the error was not prejudicial for two reasons. First, they argue that it is impossible to determine whether the incorrect interest rate was applied by the jury, inasmuch as the special verdict question concerned not only interest, but also "transportation cost." Second, defendants argue that, in any event, the jury's award was reasonable in light of the evidence.

There is no credible evidence to support the jury's $800 award for interest and transportation costs. There was no evidence that the plaintiffs actually expended any amount for interest charges connected with the purchase of the motorhome. Nor is it clear what the trial court intended by including within the question "transportation cost." There was no evidence that the plaintiffs incurred any expenses for rental of a replacement motorhome. Even if such expenses had been incurred, they would be properly included within the award for loss-of-use damages and would not constitute a separate item of damages.

It is apparent, therefore, that the award of the jury for interest and transportation costs was in substance an award of prejudgment interest. We conclude that the determination of prejudgment interest is a question of law and that it was error to submit this issue to the jury.

The plaintiffs are entitled, as a matter of law, to prejudgment interest on their claim for contract damages. The plaintiffs recovered the full $11,007.15 contract price of the motorhome. Their claims for $110 for inspection fees and $51.72 for repairs were liquidated claims. These claims, as well as the contract price of the motorhome, were fixed items of damages and their amounts were not in dispute. The plaintiffs are entitled to prejudgment interest on this sum in accordance with the general rule that prejudgment interest is available as a matter of law on a claim which is liquidable, or fixed and determinate. *Bigley v. Brandau,* 57 Wis.2d 198, 203 N.W.2d 735 (1973).

In the absence of a specific contractual rate of interest, prejudgment interest must be calculated at the legal rate

of the statute. *Kilgust Heating v. Kemp*, 70 Wis.2d 544, 549, 550, 235 N.W.2d 292 (1975). Here the legal rate was five percent. The amount of prejudgment interest which should have been awarded is thus determinable as a matter of law by applying this rate to the plaintiffs' liquidated claims. This was properly a function of the trial court, and the question should not have been submitted to the jury.

The plaintiffs should be awarded prejudgment interest at the annual rate of five percent from the date of revocation of acceptance, August 15, 1974, to the date of entry of judgment, October 23, 1975, on the sum of $11,-168.87, representing damages for the purchase price of the motorhome, inspection fees, and reimbursement for repairs.

In conclusion, therefore, we modify the judgment by decreasing the amount of the plaintiffs' damages for loss of use of the motorhome from $2,500 to $500, unless within twenty days of the date of the remittitur the plaintiffs file with the clerk of this court a notice in writing that they elect to have a new trial on the issue of loss of use of the motorhome only. If such notice electing such a new trial is timely filed, that portion of the judgment will be reversed, and the cause remanded for proceedings not inconsistent with this opinion.

That portion of the judgment awarding the plaintiffs $800 for interest and transportation costs is reversed. The plaintiffs are to be awarded prejudgment interest at the rate of five percent per annum on the amount of $11,-168.87 from August 15, 1974 to October 23, 1975, and the trial court is instructed to enter judgment accordingly.

*By the Court.*—Judgment affirmed in part; modified in part; reversed in part and cause remanded for further proceedings not inconsistent with this opinion. On appeal, costs are awarded to the respondent.